# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| IN THE MATTER OF THE EXTRADITION OF EDWIN ECHAVARRIA | ) ) ) ) ) ) ) Civil Action No. 2:23-mc-747 |

## OPINION AND CERTIFICATION

Pending before the Court is the Complaint for Extradition (ECF No. 2) filed by the United States on behalf of the Government of the Republic of Chile, which seeks to extradite Edwin Echavarria ("Respondent") to Chile.

For the reasons that follow, the Court finds that there is competent evidence to establish probable cause with respect to the criminal offenses presented and that extradition is warranted.

### I.  Relevant Procedural Background

On July 24, 2023, a Complaint was filed by the United States (ECF 1) seeking a warrant for Respondent's arrest in accordance with 18 U.S.C. § 3184 and the extradition treaty between the United States and Chile so that Respondent could be arrested and brought before the Court. The Complaint alleges that there is an extradition treaty in force between the United States and the Government of the Republic of Chile ("Chile").[1]

Article 11 of the Extradition Treaty provides for the provisional arrest and detention of alleged fugitives pending the submission of a formal request for extradition and supporting documents. Pursuant to Article 11 of the Extradition Treaty, Chile asked the United States for the provisional arrest of Respondent, a Dominican Republic citizen, with a view toward his extradition

---

[1] The Treaty between the Government of the United States of America and the Government of the Republic of Chile, U.S.- Chile, June 5, 2013, T.I.A.S. No. 16-1214 (the "Extradition Treaty") is attached to the sworn Complaint. (ECF 2-1.)

to Chile. On July 25, 2022, Guarantee Judge of the 13th Guarantee Court of Santiago, Claudia Ximena Godoy Aspee, a judicial officer authorized by Chilean law to issue warrants of arrest, issued a warrant in Santiago, Chile, for Respondent's arrest for the offenses of (1) serious injury, in violation of Article 397(2) of the Chilean Criminal Code; and (2) simple homicide, in violation of Article 391(2) of the Chilean Criminal Code. (ECF 2 §§ 5, 6; ECF 20 at 51-56 (Spanish) and 52-56 (English).) These offenses are alleged to have been committed within the jurisdiction of Chile. (*Id.*)

Pursuant to the provisions of the Extradition Treaty, the Embassy of the Republic of Chile submitted Diplomatic Note No. 94, dated June 29, 2023, that formally requested the extradition of Respondent. ECF 22, § 3. Supplemental information was provided by the Embassy in Diplomatic Note 132, which is dated September 21, 2023. (*Id.*) [2]

After the Complaint was signed by the Court (ECF 2), a warrant was issued in this Court (ECF 3) and Respondent was arrested on July 24, 2023. The next day, the government requested that Respondent be detained pending extradition proceedings. (ECF 4.) Respondent had his initial appearance on July 27, 2023 (ECF 9), during which the Court temporarily detained him pending a detention hearing and directed the government to produce Respondent's immigration file once it was received. (ECF 9.) After the file was produced, several continuances of the hearing were granted, the matter was briefed (ECF 21, 25, 30) and a detention hearing was held before the undersigned on January 3, 2024. Respondent filed a Supplement to his argument on January 12, 2024. (ECF 34.)

---

[2] The Court has reviewed the original documents provided by Chile and translations of these documents. Copies of the original versions and the translations are in the record at both ECF 20 and 22 (redacted).

2

The Court has carefully considered the relevant portions of the Extradition Treaty, the Formal Request for Extradition, the documents and exhibits submitted by the Government of Chile in support of its extradition request[3], the written submissions of the parties and the evidence and arguments presented by the parties at the January 3, 2024 hearing. Thus, this matter has been fully heard and is ready for disposition.

## II.   Extradition Process

Extradition is a diplomatic process initiated by a request from the nation seeking extradition submitted to the United States Department of State.  The process for extradition is set forth by statute and the relevant treaty. Here, the Extradition Treaty between the United States and Chile provides that the parties mutually agree to extradite fugitives who are charged with crimes in one country and subsequently found within the territory of the other. (ECF 2-1, Article 1.)

"It is well settled that the terms of an extradition treaty should be liberally construed so as to effect the intention of the parties to secure the open and reciprocal surrender of fugitives to be tried for extraditable offenses." *In re Extradition of Rodriguez Ortiz*, 444 F. Supp.2d 876, 883 (N.D. Ill. 2006) (citing *Factor v. Laubenheimer*, 290 U.S. 276, 293-94 (1933)).

The required documents for extradition of a fugitive not yet convicted in a foreign country but located within the United States include a certified copy of the warrant for the fugitive's arrest issued by a judge of the requesting party, and "[e]vidence which, in accordance with the laws of the requested Party, would justify the apprehension and commitment for trial of the person sought if the offense had been committed there." *Id.* Documentary evidence proffered by the foreign government shall be admissible in evidence if it is properly authenticated and certified by the principal consular officer of the United States in that country. *Id*., 18 U.S.C. § 3190. Appropriate

---

[3] Chile's request for extradition and supporting documents are at ECF 20 pp. 36-68, 102-180 and 265 (Spanish) and 69-101, 181-264 and 266 (English).  *See also* ECF 22.

documentation typically includes authenticated statements, *see Sainez v. Venables*, 588 F.3d 713, 717 (9th Cir. 2009) (certification of extradition based on sworn statements); or, pursuant to 18 U.S.C. § 3190, may include "[d]epositions, warrants, or other papers" if "properly and legally authenticated so as to entitle them to be received for similar purposes by the tribunals of the foreign country from which the accused party shall have escaped."

If a foreign country files a sworn complaint charging an individual found within the jurisdiction of the United States of a crime punishable by imprisonment of more than one year, and if there is an extradition treaty between the United States and the requesting foreign government, the authority of a magistrate judge serving as an extradition judicial officer is limited to whether to certify to the Secretary of State that the submitted evidence is "sufficient to sustain the charge." 18 U.S.C. § 3184. Upon such a finding, the judge is required to certify to the Secretary of State that extradition is appropriate. The judicial officer "has no discretionary decision to make," because it is the executive branch, through the Secretary of State, that controls the ultimate decision regarding whether the charged individual should be surrendered to the requesting country. 18 U.S.C. §§ 3184, 3186. However, should a magistrate judge determine that "the offense charged is not within a treaty's terms or finds an absence of probable cause, the magistrate cannot certify the matter to the Secretary of State for extradition." *United States v. Nolan*, 651 F. Supp.2d 784 ,790 (N.D. Ill. 2009), *quoting Eain v. Wilkes*, 641 F.2d 504, 508 (7th Cir. 1981).

After receiving all of the evidence, a judicial officer makes no determination of guilt or innocence, for "guilt remains to be determined in the courts of the demanding country." *Sainez v. Venables*, 588 F.3d at 717. If the judge determines that the evidence is sufficient to find probable cause and warrant extradition, the judge then certifies to the Secretary of State that the fugitive may be detained and surrendered to the requesting country and forwards all the evidence to the

4

Secretary of State. 18 U.S.C. § 3184. "The ultimate decision to extradite is a matter within the exclusive prerogative of the Executive in the exercise of its powers to conduct foreign affairs." *Esobedo v. United States*, 623 F.2d 1098 (5th Cir. 1980). Thus, the executive branch, through the Secretary of State, is the final arbiter of whether an individual will be detained in the United States and delivered to the requesting foreign county. See, 18 U.S.C. § 3186. If extradition is granted, surrender shall then be made at such time and place as determined according to the law of the required country.

**III.    Discussion**

In order to determine if the requirements of certification to the Secretary of State have been met, the Court must consider five factors: whether (1) it is authorized to conduct the extradition proceeding; (2) it has jurisdiction over the fugitive; (3) the treaty at issue is in full force and effect; (4) the crimes upon which the extradition is based are covered by the treaty; and (5) there is sufficient evidence to support a finding of probable cause. 13 U.S.C. § 3184; *see also Hoxha v. Levi,* 465 F. 3d 554, 560 (3d Cir. 2006). Each of these factors will be analyzed in order to determine if certification is appropriate.

A.   Authorization to Conduct Proceeding

An extradition proceeding can be conducted by "any magistrate judge authorized so to do by a court of the United States …." 18 U.S.C. § 3184. In addition, the local rules of this District authorize magistrate judges to "conduct extradition proceedings, in accordance with 18 U.S.C. § 3184." See LCvR 72(A)(4). Accordingly, the Court finds that it is authorized to conduct this extradition proceeding, and its authority to do so has not been challenged by Respondent.

B. Jurisdiction

The parties do not contest the Court's jurisdiction over Respondent. As Respondent was found and arrested in the Western District of Pennsylvania, he is subject to jurisdiction in this Court. *See* 18 U.S.C. § 3184.

C. Treaty is in Full Force and Effect

Among the documents submitted to the Court is the Declaration under penalty of perjury of Amy Lindsay dated September 29, 2023. (ECF 20 and 22 at 1-2.) Ms. Lindsay states that she is an attorney advisor in the Office of Legal Advisor for the Department of State, the office which has responsibility for extradition requests, and she is charged with the extradition case of Respondent. A copy of the Extradition Treaty is attached to her Declaration and is authenticated by her.

The Extradition Treaty, which was signed on June 5, 2013, is between the Government of the United States and the Government of the Republic of Chile. Ms. Lindsay declares that the Extradition Treaty is in full force and effect as of September 29, 2023. Respondent has not contested this or presented any evidence to the contrary. As suggested by the government, it is appropriate for the Court to defer to the Department of State's determination. *See Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 184-85 (1982); *United States ex rel Saroop v. Garcia,* 109 F.3d 165, 170 (3d Cir. 1997). The Court concludes it is appropriate to do so.

Thus, the Extradition Treaty has been in full force and effect from the dates of the underlying offenses for which extradition has been sought through the date of this Opinion and Order.[4]

---

[4] As will be discussed, these offenses are alleged to have occurred on June 2, 2021 and June 11, 2022.

6

D.  The Offenses that are the Subject of Extradition are Covered by the Treaty

The Extradition Treaty provides for the extradition of persons "sought by the authorities in the Requesting State for prosecution…for an extraditable offense." (ECF 2 and 22 at 8, Article 1.) It further states that an offense "shall" be extraditable if it is punishable under both United States and Chilean law "by deprivation of liberty for a maximum period of one year or by a more severe penalty." (*Id.* Article 2(1).)

Respondent has been charged in Chile with two offenses. The first is serious injury, which is a violation of Article 397(2) of its Criminal Code. (ECF 20 at 73, 74.) This offense is punishable by "minor imprisonment in its medium degree," for which a term of imprisonment ranges from 541 days to three years of imprisonment. *Id.* Respondent is also charged with simple homicide, a violation of Article 391(2) of the Criminal Code. (*Id.* at 93.) Punishment for this offense is "major prison in its medium degree," which is anywhere from ten years and one day to fifteen years of imprisonment. *Id.* Thus, punishment for both offenses is a term of imprisonment of more than one year. The statute of limitations has not expired with respect to either offense. (*Id.* at 77-78, 184.)

It next becomes necessary to determine if the conduct with which Respondent has been charged in Chile would be criminal conduct in the United States under either federal law, Pennsylvania law or the law of a preponderance of states. *See Wright v. Henkel,* 190 U.S. 40, 61 (1903); *In re Extradition of Manzi,* 888 F.2d 204, 207 (1st Cir. 1989). If so, it is also necessary to determine that the comparable offense is subject to imprisonment for more than one year.

Under Chilean law, the offense of serious injury is described as injuring, beating or otherwise mistreating a person that causes that person illness or incapacity to work for more than thirty days. (ECF 20 at 74, 93.) The documents submitted to the Court indicate that Respondent attacked E.R. with a large knife or machete, and as a result of the injuries he sustained, E.R. was

7

disabled for more than thirty days. This is comparable to the crime of aggravated assault under Pennsylvania law, a second-degree felony, which includes conduct that "intentionally or knowingly causes bodily injury to another with a deadly weapon." 18 Pa. C.S. §2702(4). Punishment for aggravated assault is a term of up to ten years imprisonment, 18 Pa. C.S. §1103(2). Moreover, even if the offense for which Respondent is charged is viewed as comparable to simple assault, a second-degree misdemeanor under Pennsylvania law which is defined as intentionally, knowingly or recklessly causing bodily injury to another person, the punishment is a term of imprisonment of up to two years. 18 Pa. C.S. § 1104(2).

The second offense of simple homicide under Chilean law is committed when a person murders another person. (ECF 20 at 93.) Under Pennsylvania law, it is a crime to commit murder, a first-degree felony. 18 Pa. C.S. §2502(c). Murder is punishable by a term of imprisonment of up to twenty years. 18 Pa. C.S. §1103(1). Under Federal law, other than felony murder and premeditated murder, murder is in the second degree and subject to a term of imprisonment of up to life. 18 U.S.C. §111.

Thus, the offenses with which Respondent has been charged in Chile are subject to extradition pursuant to the terms of the Extradition Treaty. Both are punishable under Chilean and United States law by maximum terms of imprisonment of more than one year.

E. Probable Cause

The standard for determining whether there is probable cause is "whether the government offered evidence to 'support a reasonable belief that [the defendant] was guilty of the crime charged.'" *Sidali v. I.N.S.,* 107 F.3d 191, 199 (3d Cir. 1997) (citation omitted). A comparable standard exists for a federal preliminary hearing, that is, whether there is competent evidence that justifies holding the defendant for trial. *Id.*

The same inquiry applies in the context of an extradition hearing, in which the court conducts "essentially the same preliminary inquiry typically required for issuance of a search warrant or an arrest warrant…" *Haxhiaj v. Hackman,* 528 F.3d 282, 287 (4th Cir. 2008). *See also Sidali v. I.N.S.,* 107 F.3d 191, 199 (3d Cir. 1997) (it is only necessary to "afford reasonable ground to believe that the accused is guilty of the offense charged") (*quoting United States ex rel Lo Pizzo v. Mathues,* 36 F.2d 565, 568 (3d Cir. 1929). In determining probable cause in an extradition proceeding, neither the Federal Rules of Criminal Procedure nor Federal Rules of Evidence apply. *In re Extradition of Aquino,* 697 F. Supp. 2d 586, 597 (D.N.J. 2010); Fed. R. Crim. P. 1(a)(5)(A); Fed. R. Evid. 1101(d)(3). As such, hearsay evidence is admissible. *Hoxha v. Levi,* 465 F.3d 554, 561 (3d Cir. 2006).

The individual whose extradition is sought has limited evidentiary rights. He or she has no right to cross-examine witnesses, and generally may present only "evidence that explains away or completely obliterates probable cause is the only evidence admissible at an extradition hearing, whereas evidence that merely controverts the existence of probable cause, or raises a defense, is not admissible." *Barapind v. Enomoto*, 400 F.3d 744, 749 (9th Cir. 2005) (citation and quotation marks omitted). Thus, an individual facing extradition is limited to presenting "'reasonably clear-cut proof which would be of limited scope and have some reasonable chance of negating a showing of probable cause.'" *Koskotas v. Roche,* 931 F.2d 169, 175 (1st Cir. 1991) (citation omitted). By contrast, attempts to impeach the credibility of a witness are not permitted because credibility determinations are reserved for the charging county's court. *In re Extradiction of Singh,* 124 F.R.D. 571, 573 (D.N.J. 1987).

Respondent disputes that the evidence submitted by Chile establishes probable cause that Respondent was involved in the conduct for which the charges of serious injury and simple

9

homicide have been brought. Respondent therefore requests that the Government's request for extradition be denied.

The evidence related to each charge that has been submitted will be reviewed.

1. Serious injury charge

With respect to the June 2, 2021 incident, the evidence submitted states that E.R. was attacked by two men with a "really large knife or machete," resulting in injuries to his face and abdominal area. (ECF 20 at 198). E.R. recognized one of the attackers as Respondent, who he knew. (*Id.*) He called his sister, S.R., and said that "El Menor and El Piquito stabbed me." (*Id.*) S.R. knew Respondent and stated that he had previously threatened her by shooting a firearm in the air. (*Id.*) She took a cab to E.R.'s location and discovered "all of his clothes in blood with a cut on his face, a stab in the abdomen and another in his rib." (*Id.* at 196.) She took E.R. to a clinic to get medical attention. (*Id.*) While there, she saw Respondent and another male riding bicycles. (*Id.*) At around the same time, Respondent called her, said he had a gun and was looking to kill her. (*Id.*) She went to a police station the same day and filed a police report. (*Id.*) Both E.R. and S.R. identified Respondent from a ten-person photo array. (*Id.* at 198.) His injuries were photographed and show slashes on his face and abdomen. (*Id.*) A medical report prepared by Dr. Patricia Angel Lopez concluded that E.R.'s injuries were serious because they produced a disability for thirty or forty days. (*Id.*)

During the hearing, Respondent attempted to introduce evidence about the reliability of S.R.'s statements and the fact that she made threats to kill him, including threats made since Respondent has been in the United States. Respondent also claimed that S.R. was "tied" to both offenses and that the proffered evidence would negate probable cause.

The Court did not permit the introduction of this evidence. The evidence was designed to impeach S.R., undermine her credibility, and/or attempt to show that she had a motive to provide untruthful statements about Respondent. Not only is this evidence inadmissible in an extradition proceeding, but just as importantly, probable cause was established through evidence that came directly from E.R. That evidence included the fact that he stated that he was attacked by two men with a large knife or machete. He identified Respondent. as one of these assailants. He sustained injuries that are depicted in photographs taken several months after the incident and that a doctor determined were serious. Respondent also raised issues related to E.R.'s inconsistent statements, but this is a credibility determination. Moreover, Respondent's argument that the doctor's medical report is dated May 31, 2022, nearly a year after the incident, and that the photographs of E.R.'s injuries are "indecipherable"[5] goes to the weight of the evidence but is sufficient to establish probable cause that the injuries sustained by E.R. were serious because they produced a disability for thirty or forty days.

This evidence is sufficient to demonstrate that there is probable cause that Respondent committed the offense of serious injury.

  2. Homicide

According to the documents provided by the Government of Chile, on June 11, 2022, the victim was at his home in Lago Caburga No. 1025, district of Penalolen, when Respondent, who was armed with a gun, kicked and broke the kitchen door and entered the home. ECF 20 at 199, 201.) Respondent then proceeded to the victim's bedroom and shot him several times, resulting in the victim's death. (*Id.* at 201.)

---

[5] According to the documents provided, the photos were taken in October 2021 and were reviewed and described in some detail in the subsequent medical report.

As reflected in these documents, law enforcement received a call that shots were fired and a dead man was located in the house that is identified above. (ECF 20 at 201.) Upon arrival, they noted signs of forced entry at the kitchen door of the residence and found the victim as well as two men who identified the victim. (ECF 20 at 201, 202.) A medical examiner confirmed that gunshot wounds were the probable cause of death. (*Id.*at 201.) Statements were taken from multiple witnesses who stated that they were present at the time. They can be summarized as follows:

- Y.H. went out to the front of the house where she encountered three men, one of whom was armed. The armed man asked her about the victim and asked her to open the door. She went back into the house, closed the door and warned the other witnesses. Three of the witnesses stated that they intended to hide in the bathroom and R.V. and Y.H. left through the bathroom window into the side yard. E. R. went to his bedroom and under the bed. Y. H. further stated that once she went out the window, someone grabbed her and asked her where the victim was, to which she replied that she did not know who he was. At that point an armed man kicked in the kitchen door and entered the house, after which she heard gunshots. She and R.V. went out on the street, entered a barber shop, and asked them to call police. A man named Brayan asked E.R. if it was true that the victim was dead and then they both entered the deceased's house. (ECF 20 at 202-203.)
- R.V. stated that as she left the bathroom, she saw someone she knew as "Diwi" kick open the kitchen door and enter the house with his "arm." Two other men were outside the house. She heard gunshots, saw Diwi and the other two men leave the house and then found the victim dead on the floor. After they left the house, they

12

encountered Respondent's brother, who stated that Respondent told him that he was going to kill the victim. (ECF 20 at 202-203.)

- G.M.M. stated that around 8 p.m., he heard screams from the second floor where he lived, saw three women and two men arguing in the backyard and told his family to hide. He saw one of the men kicking the kitchen door and a few minutes later, heard one of the women shout "he killed him" and saw them running toward the street. (*Id.*)

- M.J.M. stated that she was in the bathroom and heard someone ask where the victim was. She heard gunshots and saw him lying on the floor. E.R. told her to leave the house, where she met another Dominican who asked if it was true that the victim had been killed. This person and E.R. entered the house and she departed. (*Id.*)

- E.R. stated that after the women entered the bathroom, he saw a man nicknamed "Diwi" and other men approaching the house so he went into his bedroom to hide. He heard them kick the kitchen door, and Diwi asked one of the men to give him the gun. He then heard eight gunshots. He also heard a woman scream "he killed him." He left the house with the women and they encountered a person who E.R. identified as M.C., who is Diwi's brother. M.C. asked if it was true that the victim was killed and they both went to the house. At that point, the police arrived and took them to the police station. E.R. further stated that "Diwi" is from the Dominican Republic and identified him is the Respondent. (*Id.*)

- M.C.C. stated that on the night in question, he received a call from the victim, who said: "come, he is here." He asked who but did not receive an answer and then heard noise. He arrived at the house but did not initially enter. Instead, he found the

13

individuals who left the house, including E.R., who stated: "they killed him." He and E.R. then entered the house and found the victim on the floor covered in blood. At that point the police arrived and made him leave. (*Id.* at 204.)

On June 13, 2022, the police presented two photographic sets with ten images each, including that of Respondent, in separate sessions with E.R., Y.H. and R.V. in the presence of two police officers. All of these witnesses identified Respondent as the person who kicked in the door and had a firearm. (ECF 20 at 204, 233-243.) They also identified him from surveillance footage. (*Id.* at 245-251, 258.)[6]

At the hearing, Respondent attempted to solicit evidence that S.R. is tied to both offenses. Respondent argued that S.R. has made threats against Respondent, that she has threatened to kill him if he is returned to Chile, that she directed the killing of a family member of Respondent, that she told his family that she would take money to drop the charges, and that the homicide related to drug trafficking in which she was allegedly involved. Respondent also sought to introduce evidence about S.R.'s current feelings against Respondent. Respondent argued that this evidence related to S.R.'s reliability and that her motives completely negate probable cause.

The Court did not permit the introduction of this evidence. This evidence went to the credibility and reliability of the evidence presented by Chile, evidence that is inadmissible in an extradition proceeding.

Here, the Court finds that there is probable cause that Respondent committed the crime of homicide under Chilean law. Multiple witness statements, as well as surveillance video footage, established that a group of men approached the victim's residence, the kitchen door was kicked in, and a man armed with a firearm entered the residence, after which shots were fired. The victim

---

[6] *See also* surveillance footage. (ECF 20 at 255-261.)

was found dead, having been shot multiple times. His gunshot wounds were confirmed by a medical examiner to be the probable cause of his death. Multiple witnesses identified Respondent as the shooter. While Respondent points out certain inconsistencies in their statements, any consistencies go to the weight of the evidence. And while there may be additional evidence that can be submitted at trial, about S.R. and/or drug trafficking, the Court finds that the information provided by Chile is sufficient to establish probable cause.

### Certification

Pursuant to 18 U.S.C. §3184, the Court certifies to the United States Secretary of State that Edwin Echavarria has been charged with the crimes of serious injury and homicide, that these crimes are extraditable offense pursuant to the Extradition Treaty between the United States and the Government of the Republic of Chile, and that sufficient evidence has been presented to sustain the charges under the provisions of the Extradition Treaty. Therefore, extradition is warranted.

Dated March 5, 2024                                           /s/ Patricia L Dodge
                                                              PATRICIA L. DODGE
                                                              United States Magistrate Judge